E. P. ELLIS, Trustee in Bankruptcy of Estate of
BROWN CLIPPARD, Appellant, v. BROWN
CLIPPARD, CORA A. CLIPPARD and ANNA
KIEHNE.

Division One, August 27, 1924.

1. **FRAUDULENT CONVEYANCE: Deed by Husband to Wife: Pre-
ferred Creditors.** A conveyance of land by a husband to his wife
of their valuable homestead, but heavily incumbered, in considera-
tion of money paid by her to him substantially more than she
received by the deed to her, is not fraudulent as to his creditors,
especially where she turned the money over to him in order that
he might pay certain of his debts, and he used it to pay them,
and neither thought he was insolvent at the time, and the evidence
fails to show he was. Even if actually insolvent, he had a right
to prefer a creditor.

2. ———: ———: **Wife's Participation in Fraud.** A conveyance by
a husband to his wife of their valuable homestead, heavily incum-
bered, for a valuable consideration, if she in no wise participates
in the fraud, if fraud on his part there is, is not fraudulent as to
her.

Headnotes 1 and 2: Fraudulent Conveyances: 1, 27 C. J. secs.
260, 363; 2, 27 C. J. 260.

Appeal from Cape Girardeau Court of Common Pleas.
—*Hon. John A. Snider,* Judge.

AFFIRMED.

*A. M. Spradling* and *Hardesty & Limbaugh* for
appellant.

(1) This conveyance is void by reason of the
grantor's fraudulent intent and the grantee's knowledge
thereof. Sec. 2276, R. S. 1919. (a) The grantee is the
wife of the grantor. Storage Co. v. Kuhlman, 238 Mo.
685. (b) As she claims to be his grantee merely for a
fresh consideration and not to protect any antecedent
debt, she can enjoy no protection as to her claim if she
had prior knowledge of his fraudulent intent. Gust v.

Hoppe, 201 Mo. 300; Lockran v. Rustan, 9 N. D. 43; 20
Cyc. 643. (c) The background of his intent in the con-
veyance shows fraud. Otto Stifel Co. v. Saxy, 273 Mo.
159. (d) His prior and subsequent statements and con-
duct in evidence are competent proof of his fraudulent in-
tent. Baldwin v. Short, 125 N. Y. 553; Meyer v. Mayo,
187 N. Y. Supp. 346; Holmes v. Braidwood, 82 Mo. 610;
Bump's Fraud. Con. (3 Ed.) 582, 583; 27 C J. 468, 817;
Bennie v. Schnecko, 100 Mo. 250; Blue v. Penniston, 27
Mo. 272; Zehnder v. Stark, 248 Mo. 39; Cole v. Cloe, 231
Mo. 236; Snyder v. Free, 114 Mo. 376. (e) The back-
ground of her part in the conveyance shows badges of
fraud and her knowledge of his fraudulent intent. Black
v. Epstein, 221 Mo. 286; Mason v. Perkins, 180 Mo. 702;
Bennie v. Schnecko, 100 Mo. 250; Snyder v. Free, 114 Mo.
376; 29 Cyc. 1115; Dismukes v. Johnson, 199 Fed. 319; 20
Cyc. 465, 115; Henderson v. Bank, 123 Ala. 547; First
National Bank v. Maxwell, 123 Cal. 360; Byer v.
Taylor, 50 Ark. 314. (f) Her knowledge of his fraudu-
lent intent is further shown by their badge of fraud in
"overacting the part" by having her assume active
management of the lands he had been handling
exclusively for more than twenty years. State to use v.
O'Neill, 151 Mo. 67. (g) Her knowledge of his fraudu-
lent intent is further shown by their badges of fraud in
trying to bolster up the deal with an appearance of
honesty by setting up her prior release of dower as a
consideration for this conveyance, and by having the
deed recite "one dollar and other considerations."
Woodson v. Pool, 19 Mo. 340; State to use v. O'Neill, 151
Mo. 158; Baldwin v. Whitcomb, 71 Mo. 651. (h) The
evidence reveals the motor company as the chief cause
of their mutual fears on May 24, 1920, and these fears
are confirmed by the amount and character of the claims
allowed against his estate at the time of the trial and
before the one-year period for filing had expired.
Bankruptcy Act of 1898, sec. 57 (n). (i) In this transac-
tion he made an absolute conveyance to her in considera-

tion of her merely securing with her property a loan to him, and she knew that to no grantee but herself, as his wife, would he have made such absolute conveyance prior to the grantee either paying or assuming his said loan or debt. (2) As to his creditors this conveyance to his wife was without consideration. (a) She did not become his creditor but merely became his surety. Barrett v. Davis, 104 Mo. 556; Gore v. Townsend, 105 N. C. 228, 8 L. R. A. 443; Hearne v. Keath, 63 Mo. 84; Taylor v. Fuqua, 203 Mo. App. 581; Citizens Bank v. Burrus, 178 Mo. 716. (b) No conveyance to a surety can be upheld against the creditors of the principal where the surety has neither paid nor assumed the debt. Kendall v. Baltis, 26 Mo. App. 411; Felder v. Ervin, 36 L. R. A. 345; Albert v. Besel, 88 Mo. 150; State to use, Kramer v. Mason, 96 Mo. 559; 20 Cyc. 494, 495; Craft v. Schlag, 61 N. J. Eq. 567; Concord Const. Co. v. Plante, 121 N. Y. Sup. 1026; 18 C. J. sec. 43, p. 163; Rollin v. Ross, 120 Mo. 208; National Tube Works v. Mfg. Co., 118 Mo. 635; Seger's Sons v. Thomas Bros., 107 Mo. 365; State ex rel. v. Hope, 102 Mo. 410; Ball v. O'Neill, 64 Mo. App. 380; Pattison v. Letton, 56 Mo. App. 331. (c) Her dower that had been previously assigned must be deemed voluntary and insufficient as a consideration for this conveyance, as against his existing creditors. Woodson v. Pool, 19 Mo. 340.

*James A. Finch* and *Oscar A. Knehans* for respondents.

(1) There is a resulting trust in the wife's favor and she is the equitable owner of the land where same is purchased by her or conveyed to her as a gift with no intention that any interest in it should be conveyed to the husband, although by mistake his name is included as one of the grantees in the deed. Turner v. Home Ins. Co., 195 Mo. App. 138; Alkire Grocer Co. v. Ballenger, 137 Mo. 369; Hudson v. Wright, 204 Mo. 412; Johnston v. Johnston, 173 Mo. 118; Donovan v. Griffith, 215 Mo.

149, 166; Haguewood v. Britain, 273 Mo. 89; Blake v. Meadows, 225 Mo. 1.    (2)   Though the title to land has been in the name of husband and wife for twenty-four years, a conveyance by husband to a son, and by the son to the mother, will not be set aside as fraudulent, where it appears that the mother purchased and paid for land with her own money.  Gill v. Newhouse, 192 S. W. 431; Ingalls v. Ferguson, 138 Mo. 358; Dull v. Merrill, 69 Mich. 49; McClain v. Abshire, 72 Mo. App. 390; Garner v. Findlay, 110 Fed. 123; Blake v. Meadows, 225 Mo. 1.    (3) Fraud as to creditors in a conveyance cannot be shown by a mere inference, but must be proved, and if the facts shown are equally consistent with an honest purpose, fraud will not be inferred.  Ulrich v. Price, 233 S. W. 401; Garesche v. McDonald, 103 Mo. 1.    (4)   The voluntary conveyance by a person in debt is not, as to a subsequent creditor, fraudulent *per se,* but there must be proof of actual or intentional fraud.  An insolvent person may make a conveyance to his wife, which will be good against subsequent creditors, unless made with the intent to hinder, delay and defraud subsequent creditors.  Loy v. Lorick, 100 Mo. App. 105; Payne v. Stanton, 59 Mo. 158; Krueger v. Vorhauer, 164 Mo. 156; Wallace v. Penfield, 106 U. S. 260.    (5)   Fraud cannot be inferred from the mere fact that the seller was in debt.  State ex rel. v. Merritt, 70 Mo. 275.    (6)   Fraudulent intent on the part of the debtor is not sufficient to defeat a preference. It must be shown that the transferee or creditor participated in it.  National Co. v. Machine Co., 118 Mo. 365; Hill v. Taylor, 125 Mo. 342.    (7)   "While courts are astute to discover fraudulent schemes to defraud creditors, and will scrutinize very closely all transactions between husband and wife when it is charged that the husband is covering his property in his wife's name, they have not yet put an embargo upon the wives of unfortunate debtors which will prevent them from securing homes for themselves and families, when the husband has failed."  Gruner v. Scholz, 154 Mo. 415.    (8)   A debtor,

though unable to pay all his creditors, may pay one or more to the exclusion of the others, either in money or the transfer of property; and the favored creditor or creditors may accept such preference. If the preferred creditor, in such cases, acts in good faith and takes the money or property for the sole purpose of saving a bona-fide debt, mere knowledge that the debtor intended to hinder, delay or defraud his creditors does not render the transaction void as against the creditors taking the preference; for simple knowledge under such circumstances does not amount to a participation in the intended fraud. Bank v. Fry, 216 Mo. 34; Shelley v. Boothe, 73 Mo. 74; Albert v. Besel, 88 Mo. 150; Alberger v. White, 117 Mo. 363; Holmes v. Brainwood, 82 Mo. 610; Wall v. Beedy, 161 Mo. 625; Farmers' Bank v. Worthington, 145 Mo. 91; State ex rel. v. Rubber Mfg. Co., 149 Mo. 214.

JAMES T. BLAIR, P. J.—Appellant as trustee in bankruptcy of the estate of Brown Clippard, bankrupt, brought this suit to set aside deeds whereby the equity in 197.22 acres of land, hereinafter referred to as the "home place," was conveyed by Brown Clippard to Cora A. Clippard, his wife. The petition alleges the conveyance was without consideration and was made to hinder, delay and defraud. existing and subsequent creditors. It is admitted that respondent Alma Kiehne neither had knowledge of nor was in any way a participant in any wrongdoing, if any there was, but was a mere conduit of title and acted in all respects in good faith. The trial court refused to set aside the conveyances, and this appeal followed.

In 1894, the tract in question was conveyed to Brown Clippard by his father, J. C. Clippard. In 1898, Brown Clippard and Cora A. Hartle, now Cora A. Clippard, were married and went to live on this land and have made it their home ever since. In 1900, Emanuel Hartle, Cora A. Clippard's father, desired to give her a farm. At this time A. H. Clippard, a brother of Brown, was the record

owner of a tract of 166.65 acres which adjoined the home place of Brown and Cora. He had exchanged this tract for a 208 acres owned.by his father, but the deeds had not been recorded, and before they were Clippard, Sr., got an intimation of Hartle's wish to secure the 166.65 acre tract for his daughter. Hartle bought this land from Clippard, Sr., and presented it to Cora A., his daughter. The un-recorded deed from A. H. Clippard to his father was de-stroyed, and a deed conveying the tract to Cora A. was executed by A. H. Clippard and wife and J. C. Clippard and wife and duly delivered and recorded. It apparently occurred to J. C. Clippard that it would be a good idea to have this deed made to his son and his wife, Cora A. Clippard, jointly, and at his suggestion this was done. He fully understood the effect of such conveyance. Neither Hartle, who was paying J. C. Clippard for the land, nor Cora A., for whom her father was buying it, nor Brown, the beneficiary of his father's vicarious generosity, knew or suspected the deed had been so made until nearly twen-ty years had passed. No one but Emanuel Hartle paid a dollar on the consideration for the transfer. There-after, the home place and the 166.65 acre tract were farmed together. In the family and out in the neighbor-hood the land was known as "Cora's." She always spoke of it that way and so did her husband. He made no claim whatever, direct or implied, to any interest in the tract.

Brown Clippard was an enterprising farmer and as time passed he began to collect a goodly amount of person-al property and, later, to buy more land. In March, 1916, he bought the Kneibert or Shaner farm of 193 acres. He paid some cash and secured the remaining $8000 of the purchase price by deed of trust. August 24, 1916, he bought 46 acres from Robinson; in May, 1917, he pur-chased 20 acres from the Lafe Estate; in June, 1919, he added to these 138.66 acres, bought from Nichols, and the three parcels are called in the record the Nichols farm. In December, 1919, he bought the Mercer Wilson place

of 92.36 acres. He executed a trust deed on this land to secure $9000 of the purchase price.

Wash Miller was cashier of the Bank of Oak Ridge and had the esteem and confidence of the community and all who knew him. Brown Clippard lived near Oak Ridge, and Miller became his banker, business adviser and friend. In the course of his buying, selling and trading Brown Clippard was usually in debt in considerable sums, but seems to have had a net worth of respectable amount to begin with and to have increased this some by his operations in 1916, 1917 and 1918. In 1917 or 1918 the Minton-Thompson Motor Company was incorporated. Brown Clippard subscribed to the capital stock in the sum of $5000. The whole capital was $40,000. The company was located at Cape Girardeau and sold automobiles and operated a garage. It seems to have prospered for some time. Miller seems to have owned some of its stock. In the early part of 1920 Brown Clippard was induced by Wash Miller to invest $6250 in stock of an advertising corporation. The note to cover this was made to the Bank of Oak Ridge. The stock was never delivered to Brown Clippard. In March, 1920, Wash Miller, cashier, "got into trouble" and his bubble burst. The net cash loss of this to Brown Clippard seems to have been the $6250 note mentioned. Clippard was still active. Prices were high and he had a great deal of property. The Kneibert farm was worth $19,000 or $20,000. The home place was worth about $17,000 to $17,500. The Nichols farm was worth at least $5000. Clippard testified he got $10,000 for it in the summer. It seems clear that he did get substantially more than $5000. The Mercer Wilson farm was worth $14,000 and probably more. Brown Clippard testified it was worth $225 per acre, and that in the summer or fall of 1920 he conveyed it in consideration of an assumption and agreement to pay $18,000 of his debts. No refutation of this was attempted. These minimum real estate valuations aggregate $55,000. The maximum valuations

aggregate $68,000. Of personal property Brown Clippard owned eight mules he valued at $1600; three mares, at $600; 125 sheep, at $1250; 35 hogs, at $700; 10 brood sows, at $300; 50 or 60 pigs and shoats, at $500 or $600; 40 head of cattle, at $2400 to $2600; 25 head, at $750; 5 or 6 registered polled Angus cattle, at $750, or $900; 1200 bushels of corn, then worth a little over $3 per bushel, $3600; 40 or 50 tons of hay, then worth $20 per ton, $800 or $1000; farm machinery, including tractor, $4000 or $4500; a Nash car, later disposed of for $1000; A Reo "speed wagon," $600 or $700; $11,666 worth, face value, of Minton-Thompson Motor Company stock which he "placed at par;" the "company had paid dividends the year before." These minimum valuations aggregate $18,850, without counting the $11,666 Motor Company stock. With this added, the total would be $30,510. If the maximum valuations are taken the total would be $31,760. There was no real effort to disprove these estimates of Clippard. It must be remembered that prices were then high, and that it was under the then situation Brown Clippard's intent is to be judged. It may be he took at that time a rosy view of the values of some of the things which were his, but rosy views of that kind were epidemic at that time. The total of values of real and personal property Brown Clippard owned in May, 1920, as given, are given as from $85,510 to $99,960. At that time he was heavily indebted. The banks seem to have loaned to him freely. He owed a store account of $20.25; a doctor's bill of $63.35; and owed his lawyer $68.25. He owed banks $24,980. Of this $12,500 was secured by mortgage and $2500 by collateral. All but $2160 of this then existing bank indebtedness seems to have been paid subsequently. On $1250 of this $2160 Brown Clippard was a maker, but the note was given for the benefit of the Minton-Thompson Motor Company and carried some collateral. He owed $8000 secured by deed of trust on the Kneibert place. This was thereafter paid. A deed of trust on the Mercer Wilson place secured $9000. This

305 Mo.—16.

was subsequently paid. He owed nine different individuals $9145, and was surety on notes for $2000. Among these he owed his wife $1150 on an unsecured note, given two or three years before for money she had received from her father's estate and had loaned to Brown. Of this $11,145 at least $7300 was subsequently paid. He has not paid his wife's note, so far as the record shows. The other item is the Wash Miller note of $6250 for the stock which Miller did not deliver. The total of all this indebtedness was about $58,700. This included the sums for which he was surety only. While the record is a little difficult in this connection, it appears that at least $46,670 has been paid. The fact of payment after May, 1920, is stated for what it is worth upon the question of Brown Clippard's intent at the time the deeds here in question were made.

In this situation the Cape County Savings Bank and the Jackson Exchange Bank, each of which held Brown Clippard's note for $3900 and some interest, asked for payment. While Clippard had valuable equities in the tracts of land he owned, he owned no land which was not encumbered. As both he and his wife and the whole community understood it, Cora A. Clippard owned the 166.65-acres farm and it was clear. The husband told the wife that the two banks wanted their money. The finding that Cora A. Clippard was not aware at that time of the extent of her husband's indebtedness is supported by the strong weight of the evidence, as is the finding that the husband then firmly believed in his own solvency. He asked his wife to aid him in raising the money to pay the two banks who then sought payment. He requested her to do this by mortgaging her 166.65-acre tract which her father had given her. The home place was mortgaged for $7000. The equity in it was worth about $10,000. In this equity was the homestead right. The wife agreed to execute the mortgage for $10,000 on her land, and give the money to her husband to pay the banks, if he would convey to her the equity in the home place. There is no doubt that both

understood that the proceeds of this loan were to go in payment of the husband's debts, and there is no doubt that the money was actually used for that purpose. The notes of the two banks were paid and are in evidence, and the net balance, after deduction of commission paid in securing the loan, was applied in payment of various small debts. When Brown Clippard and his wife went to Jackson to transact this business they learned, for the first time, that the deed designed by her father to convey to the wife the 166.65-acre tract had been made to them both. This was corrected. There is no contention in this court that the husband ever had any title to any part of this land. If there were, the record would fully confute it. The deeds were openly made in an abstractor's office in Jackson. They were not recorded until the loan had been secured. All were then recorded at the same time. After the execution of these deeds many things happened. In June, Brown Clippard became surety on a $13,500 note of the Minton-Thompson Motor Company. The company lost the contract for the sale of the Nash car'and began to have other troubles. Clippard testifies he was assured the $13,500 note, a renewal note, was supported by collateral. The old note had been so secured. The cashier of the bank testified this collateral was surrended to the Motor Company and that he told Clippard this was done. Clippard denies this. It seems clear Clippard still believed in his own solvency. He was buying and selling, making new debts and paying old ones and acting as a man who regarded himself as a going concern. Depreciation of values set in. His equities and values of his personalty decreased. In the fall of 1920 the various transactions shown by the record disclose that Brown Clippard was engaged in a struggle to keep his head above the waters. Finally suits were brought, the crash came, and in April, 1921, he was adjudged a bankrupt.

These are the main and decisive features of the facts. There is an able presentation of the facts by appellant's counsel with a purpose to show an intent on Brown Clip-

pard's part on May 24, 1920, to defraud his creditors; that he had concocted a scheme to defraud them and that the deeds made on that day were a part of the plan as were all his subsequent transactions; that Cora A. Clippard must have known her husband's intent on May 24, 1920, and, knowing it, participated in it and did what she did merely to aid in the perpetration of his fraud. There are many interesting circumstances which might be discussed in detail. These pertain to Brown Clippard's intent. The evidence with respect to many or all of them is sharply conflicting. There is nothing in this record which would justify us in overturning the findings of fact necessarily implicated in the trial court's decree. Cora A. Clippard, when the homestead is considered and all is said, gave her husband substantially more in cash than she received by his deed to her of the home place equity. She turned this money over to him in order that he might pay debts he owed. He took the proceeds and actually used them to pay these debts. . Even if actually insolvent, he had the right to prefer a creditor. This evidence does not show that either Brown Clippard or his wife thought he was insolvent or approaching insolvency. It cannot be said, in any event, that the trial court's finding that Cora A. Clippard did not participate in her husband's fraud, if fraud there was, is disproved by this record. The contrary is true.

The judgment is affirmed. All concur.